Steven Sugarman
New Mexico Bar No. 5717
*pro hac vice* application pending
347 County Road 55A
Cerrillos, New Mexico 87010
(505) 672-5082
stevensugarman@hotmail.com

Judy Calman
New Mexico Bar No. 138206
*pro hac vice* application pending
142 Truman Street NE, Suite B-1
Albuquerque, New Mexico 87108
(505) 843-8696
judy@nmwild.org

Attorneys for WildEarth Guardians

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

TUCSON DIVISION

| | | |
|---|---|---|
| WILDEARTH GUARDIANS and NEW MEXICO WILDERNESS ALLIANCE, | ) ) ) | |
| Plaintiffs, | ) ) | No. |
| vs. | ) ) | |
| UNITED STATES DEPARTMENT OF JUSTICE | ) ) ) | **COMPLAINT FOR DECLARATORY AND** |
| Defendant. | ) ) ) ) | **INJUNCTIVE RELIEF** |

Complaint - Page 1

## PRELIMINARY STATEMENT

1.      The Mexican gray wolf (*Canis lupus baileyi*) once roamed by the thousands across portions of Arizona, New Mexico, Texas, and the Republic of Mexico.  Federal eradication efforts – which were largely prompted by a desire to protect private livestock interests – began in earnest in 1915.  After about fifteen years of trapping, shooting, and poisoning of adult wolves, and the "denning" of pup wolves (poisoning wolf pups in their dens or digging them out of dens and killing them), very few Mexican gray wolves remained in the wild in the United States.

2.      In 1970, the last surviving Mexican gray wolf known to be living in the wild in the United States was killed in Arizona.  Recent research in Mexico has revealed few reports, and no confirmations, of wild ranging wolves currently residing in that country.

3.      In 1976, the Mexican gray wolf was listed as an endangered species under the Endangered Species Act ("ESA").  41 Fed.Reg. 17736 (April 28, 1976).

4.      In the early 1980s, the United States Fish and Wildlife Service ("FWS") commenced a last-ditch effort to save the endangered Mexican gray wolf from extinction.  This effort began with a captive breeding program to establish a "stock" of Mexican wolves for eventual release into the wild.  The goal of the FWS's Mexican wolf recovery program was to reintroduce captive-bred wolves into the wild in order to establish a viable, self-sustaining population of at least 100 wolves in the species' historic range in Arizona and New Mexico by 2005.

5.      The very tenuous nature of the species' survival at the time that the captive breeding program began – and the very real possibility of extinction –  cannot be overstated.  At the time that the captive breeding program commenced, there were only five remaining Mexican gray

wolves in captivity in the entire United States.

6.      The FWS began the "release" phase of the recovery program in 1998 as a collaboration between the federal government, the states of Arizona and New Mexico, and the White Mountain Apache Tribe.

7.      The FWS selected federal public lands in Greenlee County, Arizona as the "primary recovery zone" for wolves.  The primary recovery zone, which is under the land management jurisdiction of the Apache-Sitgreaves National Forest, is the area where captive-born wolves are first freed into the wild.

8.      From the beginning, the reintroduction program was met with hostility from individuals and interests who are opposed to wolf reintroduction.  In the months following the initial release of eleven wolves into the wild in 1998, five of those wolves were illegally shot and killed in Arizona.  The remaining six wolves were brought back to captivity after those initial illegal killings.

9.      Since releases began, at least 48 wolves have been illegally shot and killed.  These 48 illegally shot wolves account for more than half of all known mortalities of reintroduced Mexican wolves.

10.     By March of 2013 – fifteen years after the first captive wolves were released into the wild – only 75 wolves roamed the Blue Range Wolf Recovery Area, a complex of public lands in Arizona and New Mexico.  Biologists are concerned about the species' continuing viability because there are only three known breeding pairs and a significant amount of inbreeding in the free roaming population.

Complaint - Page 3

11.     In a "Mexican Wolf Conservation Assessment" of 2010, the FWS wrote that the species "is not thriving."  In that Assessment, the FWS reported that the "illegal shooting of wolves is the single greatest source of wolf mortality in the reintroduced population."

12.     The American Society of Mammologists has recently written that the Mexican gray wolf "is one of the most endangered mammals in North America and its recovery seems to have stalled."

13.     The ESA's "penalties and enforcement" section contains a provision which makes knowing violations of the ESA – including the illegal shooting of listed animals – a criminal offense.  16 U.S.C. §1540(b).

14.     At the time that the Mexican gray wolf reintroduction program was developed, the FWS anticipated that "[p]otential conflicts with the livestock industry" and the associated illegal shooting and trapping of reintroduced wolves represented "a major obstacle to successful wolf recovery."  However, the FWS stated that "strong law enforcement will keep the abuse levels low."

15.     The release phase of the FWS's wolf reintroduction program was the subject of a formal rule-making procedure, and was preceded by public notice and comment.[1]  In the Final Rule announcing its decision to commence the release of Mexican gray wolves into the wilds of Arizona, the FWS stated that "killing of the wolves would be a violation of the [ESA], and of

---

[1]
        The Mexican gray wolves released into the wild were formally designated as an Experimental Non-Essential Population pursuant to Section10(j) of the ESA during this rule-making procedure.  16 U.S.C. §1539(j).  The species' Section 10(j) status provides the FWS with more flexibility in managing the population of free roaming wolves than would otherwise exist in the absence of a Section 10(j) designation.

Complaint - Page 4

this rule, and would subject the offenders to severe penalties."  63 Fed.Reg. 1758 (Jan. 12, 1998).

In a similar vein, the Final Rule states that "the [FWS] is committed to vigorous enforcement in

appropriate cases where evidence exists that illegal killing occurred."  Id. at 1759.

16.     With specific reference to shooting, the FWS's Final Rule states that shooting a

reintroduced wolf by mistake – upon the belief that the target animal was a coyote or some other

non-protected species – would not constitute a defense to criminal liability under the Endangered

Species Act ("ESA"): "Notice of general wolf locations will be publicized.  Hunters (and others)

who might shoot a wolf are responsible to identify their targets before shooting."  Id.

17.     Unfortunately, the FWS's ability to enforce the ESA's prohibition on illegal killing of

Mexican gray wolves – and other ESA-listed species – through criminal penalties has been

hindered by a 1998 policy of the United States Department of Justice ("DOJ") which DOJ calls

the "McKittrick Policy."

18.     Pursuant to the McKittrick Policy, the DOJ will not charge or prosecute individuals for

the illegal killing of ESA-listed species unless the government can prove that the defendant knew

the biological identity of the animal he was killing at the time he killed it.

19.     The DOJ's McKittrick Policy marks a substantial departure from controlling law in the

Ninth Circuit and in every other federal circuit court of appeals which has addressed the issue.

That controlling law holds that the government is *not* required to prove such knowledge since a

violation of the ESA is a general intent crime.  See United States v. McKittrick, 142 F.3d 1170,

1176-77 (9th Cir. 1998) (the government is *not* required to prove that a defendant knew the

biological identity of an animal that he killed in order to establish guilt in a criminal prosecution

Complaint - Page 5

for illegal killing under the ESA).

20.     The DOJ's McKittrick Policy is inconsistent with plainly expressed congressional intent, and eviscerates the protective mechanism of the ESA's criminal sanctions for the illegal killing of ESA-listed species.

21.     The DOJ has never published the McKittrick Policy in the Federal Register or taken any pro-active effort to disclose the Policy to the public as required by the Freedom of Information Act.  5 U.S.C. §§552(a)(1), (2).

22.     The DOJ's McKittrick Policy is a policy that is so extreme that it amounts to a conscious and express abdication of DOJ's statutory responsibility to prosecute criminal violations of the ESA as general intent crimes.  This policy imperils the government's efforts to conserve and protect listed species from extinction.  In this regard, the DOJ's policy is arbitrary and capricious and violates the Administrative Procedures Act ("APA").  5 U.S.C. §§701-706.

23.     With this lawsuit which is brought pursuant to the APA's judicial review provision and FOIA, Plaintiffs WildEarth Guardians and New Mexico Wilderness Alliance seek (1) an order enjoining the DOJ from further application of the McKittrick Policy and (2) an order requiring the DOJ to notify the public of the McKittrick Policy by the means specified in the Freedom of Information Act.

## JURISDICTION AND VENUE

24.     The Court has jurisdiction over this action under  5 U.S.C. §704 (APA provision for judicial review), 5 U.S.C. §522(a)(4)(B) (FOIA), 28 U.S.C. §1331 (federal question jurisdiction), 28 U.S.C. §2201 (declaratory judgment), and 28 U.S.C. §2202 (injunctive

relief).

25.    Venue is proper in this judicial district pursuant to 28 U.S.C. §1391(e) because this is an action against an agency of the United States and because the cause of action arises in Arizona.

26.    There exists now between the parties hereto an actual and justiciable controversy in which WildEarth Guardians and New Mexico Wilderness Alliance are entitled to have a declaration of their rights and of DOJ's obligations and further relief because of the facts and circumstances hereafter setout.

## PARTIES

27.    Plaintiff WildEarth Guardians is a non-profit corporation with more than 7,500 members nation-wide.  WildEarth Guardians maintains offices in Tucson, Arizona, Santa Fe, New Mexico, and Denver, Colorado.  WildEarth Guardians' mission is to protect and restore wildlife, wild places, and wild rivers throughout the United States.  WildEarth Guardians has an active endangered species protection campaign. As part of this campaign, WildEarth Guardians actively works to assure that the Mexican gray wolf does not go extinct and to assure that the federal government's wolf reintroduction program is successful.  WildEarth Guardians' efforts in this regard take the form of public education and outreach, commenting on all federal and state government actions affecting the Mexican gray wolf, and political advocacy to promote Mexican gray wolf conservation.  WildEarth Guardians has a long history of litigation against federal and state governments

in connection with protection of the Mexican gray wolf.  Furthermore, WildEarth Guardians' members frequently recreate in the national forests of Arizona and New Mexico where they enjoy listening to the howls of the elusive wolf and hope for opportunities to view the wolf in the wild.  WildEarth Guardians' members intend to continue their use and enjoyment of national forest lands for this purpose in the future. WildEarth Guardians is injured by the DOJ's failure to comply with the APA and the FOIA in the manners set forth below. WildEarth Guardians and its members have a substantial interest in this matter and are adversely affected by DOJ's violations of the APA and the FOIA. The relief requested in this Complaint will redress WildEarth Guardians' and its members' injuries.

28.     Plaintiff New Mexico Wilderness Alliance is a non-profit environmental organization dedicated to the protection, restoration, and continued enjoyment of New Mexico's native wildlife, wild lands and wilderness areas.  New Mexico Wilderness Alliance has approximately 5,000 members.  As part of its work on maintaining healthy ecosystems in the southwestern United States, for the past several years New Mexico Wilderness Alliance has worked on issues affecting the area's endangered wildlife, with a particular emphasis on the Mexican gray wolf. New Mexico Wilderness Alliance's wildlife work has included urging the agencies responsible for both federal land and wildlife management to increase protection for endangered species. With respect to the wolf, this has consisted of interactions with both FWS and the United States Forest Service.  New Mexico Wilderness Alliance also comments actively on the Mexican gray wolf recovery program and makes a concerted effort to improve the wolf's habitat through participation in the land use planning process for national forest lands.  New Mexico Wilderness

Alliance comments on proposed actions which may affect the wolf, issues updates, newsletters and alerts to all its members, and engages the public in administrative processes affecting the wolf.  New Mexico Wilderness Alliance also organizes backpacking trips and hikes in the Greater Gila area for its members, and many of its members enjoy the area on their own and strive to experience wolves firsthand.  New Mexico Wilderness Alliance's members intend to continue their use and enjoyment of lands in the Greater Gila region for this purpose in the future.  New Mexico Wilderness Alliance is injured by the DOJ's failure to comply with the APA and the FOIA in the manners set forth below.  New Mexico Wilderness Alliance and its members have a substantial interest in this matter and are adversely affected by DOJ's violations of the APA and the FOIA. The relief requested in this Complaint will redress New Mexico Wilderness Alliance's and its members' injuries.

29.     Defendant United States Department of Justice is a federal government entity which, amongst other activities, prosecutes violations of federal laws including criminal violations of the ESA.  In discharging this responsibility, the Department of Justice has responsibility for making decisions as to which criminal violations will be prosecuted and which criminal violations will not be prosecuted.  While the Department of Justice has broad prosecutorial discretion in making its enforcement decisions, it does not have the authority to adopt policies which constitute an abdication of its statutory responsibility. The Department of Justice also has a mandatory obligation to comply with the FOIA by pro-actively disclosing its policies to the public.

## FACTUAL ALLEGATIONS

### A.     Relevant Provisions of the ESA

30.     The purpose of the ESA is to "provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered and threatened species …." 16 U.S.C. § 1531(b).  The ESA defines conservation as "the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to [the ESA] are no longer necessary." Id. § 1532(3).  Accordingly, the ultimate goal of the ESA is not only to temporarily save endangered and threatened species from extinction, but also to recover these species to the point where they are no longer in danger of extinction and thus no longer need ESA protection.

31.     The ESA promotes species recovery in myriad ways, including the protection of individual animals.  Principal among the ESA's protections is the Section 9 prohibition on "take."  See 16 U.S.C. §1538(a)(1)(B) (rendering it illegal for "any person" to "take" any species listed as endangered), 50 C.F.R. §17.31 (expanding the take prohibition to those species listed as threatened).[2]

32.     In 1978, Congress amended ESA Section 9 – the ESA provision prohibiting "take" referenced in the paragraph immediately preceding – to make criminal violation of the ESA "a general rather than a specific intent crime."  1978 U.S.C.C.A.N. 9453, 9476.

---

[2]     To "take" means "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct."  16 U.S.C. §1532(19).

Complaint - Page 10

33.     Whereas the pre-1978 Section 9 provided that only "willful" violations of the ESA constitute a criminal offense, the amended Section 9 provides that "knowing" violations of the ESA are criminal offenses.

34.     All federal courts of appeal which have construed amended Section 9 in light of the contemporaneous legislative history – including the Ninth Circuit Court of Appeals – have found that a person violates the ESA and is subject to criminal penalties if he kills an ESA-listed species, regardless of whether he knew the biological identity or the protected status of the animal he killed at the time that he killed it.   United States v. McKittrick, 142 F.3d 1170, 1176-77 (9th Cir. 1998), United States v. Grigsby, 111 F.3d 806, 817 (11th Cir. 1997), United States v. Nguyen, 916 F.2d 1016, 1017-18 (5th Cir. 1990).

35.     A person who knowingly violates Section 9's take provision by taking a listed species is subject to a penalty of up to $50,000 and one year imprisonment if the species is endangered, or a penalty of up to $25,000 and six months imprisonment if the species is threatened.  16 U.S.C. §1540(b)(1).[3]

**B.     The Department of Justice's "McKittrick Policy"**

36.     The Ninth Circuit's McKittrick decision arose from the prosecution of an individual who had been charged with a criminal violation of Section 9 as a result of killing an endangered gray wolf in Montana.  As a result of this illegal killing, the defendant in that case – Chad McKittrick

---

[3]

      As an endangered species, an individual who illegally shoots and kills a Mexican wolf would ordinarily be subject to a $50,000 penalty and one year's imprisonment. However, under the species' Section 10(j) designation the illegal shooting of a Mexican wolf is treated as the killing of a threatened – rather than endangered – species.

– was charged with three counts, including one count of illegal take in violation of 16 U.S.C. §1538(a)(1)(G) and 16 U.S.C. §1540(b)(1).

37.     At trial, Mr. McKittrick testified that he did not know that the animal he killed was an ESA-protected gray wolf.  He further testified that he thought that the animal he killed was a rabid dog, and offered this "mistaken identity" argument as a defense to the ESA illegal take count.

38.     The jury convicted Mr. McKittrick of all three counts, and he was sentenced to six months imprisonment.

39.     At Mr. McKittrick's sentencing hearing, the presiding judge reviewed Mr. McKittrick's trial testimony as to his "mistaken identity" defense, and found that his trial testimony as to this issue was not credible.

40.     Mr. McKittrick appealed his conviction to the Ninth Circuit, raising various claims of error including "that his taking of the wolf was not 'knowing' because he did not realize what he was shooting."  McKittrick, 142 F.3d at 1173.

41.     The Ninth Circuit affirmed Mr. McKittrick's conviction.  In so affirming, the Ninth Circuit specifically and expressly rejected Mr. McKittrick's argument that establishing a criminal violation of the ESA arising from illegal take requires proof that the defendant knew the biological identity of the species he killed at the time he killed it.  McKittrick, 142 F.3d at 1176-77.  The Ninth Circuit reviewed the legislative history of Section 9 and case law construing Section 9, and held that the ESA's criminal penalties provision "requires only that McKittrick knew he was shooting an animal, and that the animal turned out to be a protected gray wolf."

Complaint - Page 12

McKittrick, 142 F.3d at 1177.

42.     Subsequently, Mr. McKittrick submitted a petition for a writ of certiorari to the United States Supreme Court in which he again sought to overturn his conviction on a number of grounds, including the fact of his alleged "mistake" in killing the gray wolf.

43.     In response to the petition, the Solicitor General submitted a responsive brief to the Supreme Court in which he stated that the Ninth Circuit had misapplied the law regarding the degree of intent required to establish a criminal violation of ESA Section 9 arising from illegal take.  The Solicitor's response to the certiorari petition also stated that DOJ would no longer utilize a jury instruction which instructed the jury that the government need *not* prove that the defendant knew the biological identity of an animal that he killed in order to establish criminal liability under the ESA.

44.     The Supreme Court denied Mr. McKittrick's petition for a writ of certiorari.

45.     In a memorandum authored by FWS personnel regarding the Solicitor General's response to Mr. McKittrick's petition for certiorari, the FWS states that "the Solicitor General has changed its position concerning the definition of 'knowingly' under the ESA."

46.     DOJ formalized its position on the "knowing" issue when it issued an internal memorandum entitled "Knowing Instruction in Endangered Species Cases," along with an attachment entitled "Federal Prosecutors May Not Use Knowledge Instruction Upheld in United States v. McKittrick."  The attachment explained that the jury instruction used in the McKittrick case "stated . . . that the government was not required to prove the defendant knew the biological identity of the animal at the time he shot it."  According to the memorandum, "[a]ll Department

Complaint - Page 13

prosecutors are instructed not to request, and to object to, the use of the knowledge instruction at

issue in <u>McKittrick</u>."

47.     This policy was explained by DOJ employees in an article that appeared in the July 2011

edition of the "United States Attorneys' Bulletin."  The article explains:

> Knowing violations of the ESA are punishable criminally.  16 U.S.C. §1540(b)(1)
> (2011).  ESA criminal violations are thus general intent crimes; it is not necessary
> that the defendant know the legal status of the animal (for example, that it was
> listed as endangered or threatened) or intend to violate a law.  However, the
> position of the government is that the defendant must know the biological identity
> of the animal at issue.  Prosecutors need to be aware of this Department of Justice
> requirement as it does not appear in the available case law . . . . For more
> information, see the Department's *McKittrick* Policy, available at [a URL which is
> no longer active on the Department of Justice's website].

48.     DOJ's McKittrick Policy remains in effect, despite the fact that it has been criticized by

officials in federal and state wildlife agencies, including the FWS and the AzDGF.

49.     DOJ has never published the McKittrick Policy in the Federal Register, or disseminated

the policy to the public by any other means.

**C.      Application of the McKittrick Policy**

50.     As noted above, DOJ's McKittrick Policy has been criticized by officials in federal and

state wildlife agencies because it hampers criminal prosecutions under the ESA and, accordingly,

the protection and conservation of ESA-listed species.

51.     The gist of this criticism is that an individual who kills an ESA-listed species and thereby

hampers conservation efforts may evade criminal prosecution by raising the defense that he did

not know the identity of the animal that he killed at the time that he killed it.

52.     As one example, an FWS law enforcement employee authored a memorandum in which

he criticized the policy's adverse impact on the FWS's effort to conserve endangered grizzly bears. He wrote, with obvious sarcasm and disdain for the policy: "As soon as word about this policy gets around the west the ability for the average person to distinguish a grizzly bear from a black bear or a wolf from a coyote will decline sharply. Under this policy a hen mallard is afforded more protection than any of the animals listed as endangered."

53.     As another example, a second FWS law enforcement employee wrote as follows with respect to the McKittrick Policy's adverse impact on the federal government's effort to protect the protected gray wolf population in the Great Lakes region:

> It appears the [McKittrick Policy] provide[s] anyone wanting to kill wolves with a snare the excuse to avoid criminal prosecution under the ESA. An individual setting a snare can claim, "I set the snares for coyotes and I didn't know a wolf would get caught in my snare." There is no federal deterrent to killing this listed species with illegal snares [as a result of the McKittrick Policy].

54.     In a June 22, 2003 article in the *Los Angeles Times*, the law enforcement agent-in-charge of FWS operations in the western United States was quoted as saying that the McKittrick Policy "has effectively halted federal criminal prosecutions in shootings of grizzlies and wolves" in Montana and Wyoming.

55.     That same June 22, 2003 article in the *Los Angeles Times* reports that "Federal wildlife officials, who have tried to persuade the Bush administration to change the policy, say it has blocked them from bringing charges under the endangered species law in dozens of cases around the country," and that a past Director of FWS had unsuccessfully sought a change in the policy. The article further states that "many federal wildlife officials said the policy has given those who kill endangered animals an easy way to escape prosecution, at least under the Endangered

Complaint - Page 15

Species Act."

56.    The Endangered Species Coordinator for the Arizona Department of Game and Fish (AzDGF") has criticized the McKittrick Policy, stating that it "has prevented filing of charges under the ESA in dozens of cases around the country" and that "Arizona is advocating for a change in the policy to make it more feasible to seek criminal prosecutions, and penalties."

57.    Arizona's Endangered Species Coordinator further explained that the position of AzDGF is that a change to the McKittrick Policy "is necessary to reduce illegal killing (shooting) of endangered Mexican wolves and other endangered species."  He also stated that AzDGF officials had sought modifications to the McKittrick Policy "to make it more feasible to seek criminal prosecutions," but that "neither the Bush or Obama administrations have been persuaded to review and change the policy."

58.    When the Mexican gray wolf reintroduction program was developed, FWS officials knew that illegal killings of wolves was likely to obstruct achievement of the program's goals.  In the pre-McKittrick Policy Environmental Impact Statement ("EIS") written to assess the environmental impacts of the program, the FWS wrote that "[p]otential conflicts with the livestock industry represent a major obstacle to recovery; the emphasis on avoiding or mitigating these conflicts is for the purpose of reducing illegal killing of wolves."

59.    The pre-McKittrick Policy EIS further states that "[w]e anticipate some level of abuse of provisions for taking wolves, but believe that extensive public education efforts, as well as strong law enforcement, will keep the abuse levels low."

60.    In anticipation of possible illegal killings of Mexican gray wolves under the pretext of

"mistaken identity," the FWS's Final Rule adopting the reintroduction program states that shooting a reintroduced wolf by mistake – upon the belief that the target animal was a coyote or some other non-protected species – would not constitute a defense to criminal liability under the ESA: "Notice of general wolf locations will be publicized.  Hunters (and others) who might shoot a wolf are responsible to identify their targets before shooting."

61.     At the time that the Final Rule approving the reintroduction phase of the Mexican wolf recovery program was issued on January 12, 1998, DOJ had not yet promulgated the McKittrick Policy.

62.     Unfortunately, DOJ's subsequent adoption of the McKittrick Policy precludes the "strong law enforcement" contemplated by the FWS at the time that it developed and approved the Mexican gray wolf reintroduction program.

63.     As one example, the United States Attorney for the District of New Mexico explained the decision not to charge an individual who had killed a Mexican gray wolf with illegal take: "The policy requires federal prosecutors to prove, *inter alia*, that a defendant was aware of the facts that constitute the offense, including the biological identity of the animal."

64.     Since the Mexican gray wolf reintroduction program began in 1998, the FWS has catalogued 48 wolves that have been the victims of illegal killings.  These 48 illegally killed wolves account for more than half of all reintroduced Mexican gray wolf mortalities in Arizona and New Mexico.

65.     Application of the McKittrick Policy, in the case of the Mexican gray wolf, creates a situation in which illegal shootings hamper the FWS's reintroduction effort because the vast

Complaint - Page 17

majority of Mexican gray wolf illegal killings go unprosecuted, even in those cases where the killer admits to illegally shooting a wolf.

66.    According to the FWS, illegal shooting has caused more than half of all the mortalities of wolves released into the wild since the reintroduction program began in 1998. The FWS has tallied a total of 48 illegal shootings of Mexican gray wolves since the reintroduction program commenced.

67.    Upon information and belief, only two of the 48 illegal shootings have resulted in a prosecution for illegal take under the ESA. One of these criminal cases arose from the illegal killing in 1998 of one of the very first Mexican gray wolves released into the wild. This case was prosecuted in the United States District Court for the District of Arizona, and resulted in a plea agreement. The second of these two cases, which also resulted in a plea agreement, arose from the illegal shooting of a wolf from a pick-up truck.

68.    The frequency of illegal Mexican gray wolf shootings has had a significant adverse impact on the species, as there are still very few Mexican gray wolves in the wild. At last count, there were only 37 wolves roaming wild in Arizona and 38 in New Mexico.

69.    The FWS's "Mexican Wolf Conservation Assessment" – prepared in 2010 – states that illegal shooting of wolves is one of the primary "[t]hreats hindering the biological progress of the population and the recovery program."

70.    The McKittrick Policy has the practical effect of removing the threat of criminal prosecution for would-be wolf killers who are opposed to the reintroduction of the Mexican gray wolf. The loss of this deterrent leads to high levels of illegal shootings, and to a corresponding

Complaint - Page 18

threat to the success of the Mexican gray wolf reintroduction program.

71.     The McKittrick Policy also hampers the FWS's conservation efforts for other ESA-listed species such as grizzly bears, whooping cranes, California condors, red wolves, Louisiana black bears, and Florida black panthers, and irreparably harms the federal government's efforts to conserve these and other ESA-listed species.

72.     The McKittrick Policy is plainly contrary to congressional intent and plainly inconsistent with controlling law in the Ninth Circuit.

## CLAIMS FOR RELIEF

### First Claim for Relief
(Violation of the Administrative Procedures Act)

73.     Plaintiffs incorporate the preceding paragraphs by reference as if fully set out herein.

74.     DOJ's McKittrick Policy violates the APA because it is an arbitrary, irrational, unreasonable, and express policy that is so extreme as to amount to an abdication of DOJ's statutory responsibilities to enforce the criminal penalties provision of the ESA as intended by Congress.

### Second Claim for Relief
(Violation of the Freedom of Information Act)

75.     Plaintiffs incorporate the preceding paragraphs by reference as if fully set out herein.

76.     DOJ has violated FOIA because it has failed to make a pro-active disclosure of the McKittrick Policy as required by 5 U.S.C. §§552(a)(1), (2).

## RELIEF REQUESTED

WHEREFORE, Plaintiffs respectfully request the following relief:

Complaint - Page 19

1.      An order declaring that DOJ is in violation of its duties under the APA and the FOIA.

2.      An order declaring DOJ's McKittrick Policy invalid.

3.      An order enjoining DOJ from continuing to implement the McKittrick Policy.

4.      An order requiring DOJ to make a pro-active disclosure of the McKittrick Policy and all

other policies concerning criminal prosecution under the ESA.

5.      An order awarding Plaintiffs their reasonable costs in this action, including attorneys'

fees.

6.      Such other relief as this Court determines is just and proper.


Dated:  May 30, 2013                    Respectfully submitted,


                                         /s/ Steven Sugarman
                                        Steven Sugarman
                                        347 County Road 55A
                                        Cerrillos, New Mexico 87010
                                        Telephone:  (505) 672-5082


                                         /s/ Judy Calman
                                        Judy Calman
                                        142 Truman Street NE, Suite B-1
                                        Albuquerque, New Mexico 87108
                                        Telephone:  (505) 843-8696

                                        Attorneys for Plaintiffs


Complaint - Page 20